IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID S. PERRYMAN,<br><br>    Petitioner,<br><br>  v.<br><br>ERVIN VALENSUELA,<br><br>    Respondent. | Case No.: C 13-0311 YGR (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY** |

## INTRODUCTION

This matter is now before the Court for consideration of David S. Perryman's ("Petitioner") pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2009 conviction in San Francisco County Superior Court. For the reasons set forth below, the petition is DENIED. In addition, no certificate of appealability will be issued.

## BACKGROUND

### I.   Case History

A jury in San Francisco County Superior Court found Petitioner guilty of three counts of carjacking (Cal. Pen. Code § 215), three counts of second-degree burglary (Cal. Pen. Code § 212.5(c)), and one count of possessing drug paraphernalia (Cal. Health & Safety Code § 11364). Petitioner admitted to a prior "strike" conviction, a prior serious felony conviction,

and three prior prison terms (Cal. Pen. Code §§ 667, 667.5(b)).  (Ans. Ex. 8 at 1-2.)  The trial court sentenced him to a term of 29 years in state prison.  (*Id.* at 2.)  The California Court of Appeal affirmed the conviction and sentence in an unpublished opinion, and the California Supreme Court summarily denied a petition for review.  (Ans. Exs. 8, 10.)  Thereafter, Petitioner filed two successive habeas petitions in the California Court of Appeal, followed by one habeas petition in the California Supreme Court, all of which were denied.  (Ans. Exs. 11, 12, 14.)

On January 23, 2013, Petitioner filed the instant federal petition with eight claims.  Respondent was ordered to show cause why the petition should not be granted.  Respondent filed an Answer with a supporting memorandum and exhibits.  Petitioner filed a Traverse.

**II.    Facts**

The California Court of Appeal described the relevant facts as follows:

> The charges against Perryman arose out of three separate carjacking incidents in San Francisco. The first occurred on April 2, 2005,[] in a parking lot on Market Street. Linda DiGalbo was sitting in her Pontiac Grand Prix with the doors locked and engine running while she looked for a document. She heard a "thump" and saw a man peering in the passenger-side window. The man threw a PG & E gas utility block at the window, which "concaved" but did not break. The man threw it again, this time breaking the window.
>
> The man "dove through the window" and punched DiGalbo in the face with a closed fist "at least three times." He told her to " 'Get out of the car, you fucking bitch.' " DiGalbo tried to retrieve her purse, which contained her checks and makeup, but the man said " 'Don't, don't touch that.' " DiGalbo got out of her car and ran. The man "took off" with her car.
>
> DiGalbo described the man to police as 30–40 years old, "dirty" and "scraggly," African–American, and missing some teeth. He was wearing a dark sweatshirt with a hood. Police recovered DiGalbo's purse after the incident, but the checkbook was missing and someone had used her checks without permission.
>
> On the date of the incident, police showed DiGalbo a photo lineup that did not include Perryman. She circled a photograph of a man, writing on it he " '[h]ad similar characteristics to the person who attacked me, but I would need to see his teeth.' " On April 15, police showed DiGalbo a video lineup that did not

2

include Perryman. She pointed out an individual who looked most similar to the man who attacked her, but did not make a positive identification. She looked at a photo lineup which included Perryman in 2006, but was again unable to identify her attacker. Each time, she told police she "would have to see the person's teeth because that's what stood out to [her] the most."

At trial, the prosecutor showed DiGalbo a series of 10 photographs of African–American men with gaps in their teeth. He asked her to focus on their teeth and mouths, and identify any who bore a "resemblance in your mind to the gap in the teeth of the man who took your car on April 2nd." DiGalbo was unable to identify a particular man, but picked three photographs of men who looked the most similar to her attacker. A photograph of Perryman was one of the three she selected.

The second carjacking occurred on April 12 at a parking lot at Vermont and 15th Streets. Maria Sebastiano arrived at the lot at about 8:55 a.m. She noticed a man standing on the corner who "seemed to me very disturbed.... His eyes were bulging. He seemed sort of menacing and just standing there with a gray hooded sweatshirt...." Sebastiano parked and was on the telephone in her vehicle when she saw the man approaching. The man "busted in the passenger side window and dove his body in the car, jumped in the car, his whole body." He hit Sebastiano in the head with both fists, saying " 'I'll kill you, bitch. Bitch, I'll kill you.' " Sebastiano felt herself being pushed out of the car. She started running and screaming. Sebastiano saw the man dive into the driver's seat and speed away. Her purse and checkbook were in the car, and some of her checks were eventually used without her permission.

Sebastiano described the man as a "dingy and dirty," light-skinned African–American or Hispanic man in his 30s. She did not recall telling police he was White, explaining "I have always stated that I knew he was not entirely white." His teeth were "very bad [¶] ... [¶] spaced and crooked and missing and just not a ... full normal set of teeth." Sebastiano identified Perryman in an array of photographs police showed her about two weeks after the incident. She wrote on the photo of Perryman "This is the man who carjacked me. It is him." Sebastiano also identified Perryman in court as the man who attacked her.

The third carjacking took place on April 19 at about 8:00 p.m. at a Citibank at Post and Gough Streets. Sharon Messick had returned to her car after banking at the Citibank ATM. She heard a noise and "saw a man smashing something against my window." The object "appeared to be [a] metal square ... big, like two feet...." The window did not break, and Messick attempted to start her car. The man hit the window with the object again. The window broke and the man "[j]umped through the window head-first." He punched Messick in the nose and

3

said " 'Get the fuck out of the car, bitch.' " The man "kept punching [Messick] repeatedly on the right side of [her] head...." Messick got out of the car as soon as she was able to unbuckle her seatbelt. Her purse was still in the car, but she had her wallet with her. Messick ran, but then "turned back and watched him going through [her] car." The man then "jumped out of the window, grabbed a bag, and jumped back in the car and took off."

Messick described the man as African–American, wearing a dark gray hoodie, sweater and dark blue jeans. He had "crooked teeth" and a crooked goatee. Messick testified he appeared to have all his teeth, but "had a gap between his teeth." She identified Perryman in a photo lineup at the police department. Messick did not identify Perryman at trial.

Police took DNA samples from the steering wheels of Sebastiano's and Messick's vehicles. The sample from Messick's car was a mixture of at least three individuals' DNA. Bonnie Cheng, the criminalist who performed the testing, testified both Messick and Perryman were "possible contributors to this DNA profile." The probability of a random match was one in 176,000 for the Caucasian population, and one in 234,000 for the African–American population. The DNA profile from Sebastiano's car contained only two possible contributors—Sebastiano and Perryman. Cheng determined the probability of a random match was one in 336 billion for the Caucasian population and one in 564 billion for the African–American population.

Elaine Leung testified about a prior carjacking involving Perryman on September 3, 2002. She was driving home in the early morning hours on Van Ness Avenue approaching Sacramento Street. As she came to a "near stop" at the intersection, a pedestrian in the crosswalk "lunged at [her] car at the passenger's window side and physically dove through it shattering the window completely." The man began "beating [her] really hard as many punches as he could." He repeatedly shouted " 'Get out of the car, bitch.' " Leung struggled to free herself from her seatbelt, and "ran barefoot and bloodied across the street on Van Ness." She turned around underneath a lamppost, where she had a "good view" of her attacker, and called 911. A concrete meter box cover with "SFWD" on it was part of the evidence recovered by police investigating the case. Leung identified Perryman in a photo lineup about 20 hours after the 2002 incident, and identified Perryman at trial in this case. Perryman was arrested and charged with carjacking and robbery of Leung, as well as evading police and two counts of receiving stolen property. He pled guilty to robbery and the remaining charges were dismissed pursuant to a plea agreement.

Perryman testified he did not commit any of the carjackings. He was a homeless drug addict who frequented Erie Alley in San Francisco, where many other

4

addicts congregated. Perryman supported his drug habit by "finding things" and selling them. He sometimes took things from "abandoned" cars, but only if he knew the car's "history."

Perryman admitted being inside Messick's car and seeing DiGalbo's and Sebastiano's "abandoned" cars. Someone told Perryman about Messick's "abandoned" car being on Trainor Alley. He found the car and got inside in order to do drugs. While in the car he was "pretending like I'm at [the] Indy 500 messing with the steering wheel, driving, smoking and having fun." He saw DiGalbo's car in Spencer Alley, four or five blocks from Erie Alley. He stated he did not go in the car because "there [were] just too many people around." Perryman testified Sebastiano's car was "near my camp." "[A] guy" told him about Sebastiano's car, including information about "what's in it and was it worth it," so Perryman "went for it." He testified "around that time, around the Sebastiano time, I was so drunk and so high by then, I can't remember everything, but I can remember a guy telling me about the car, but I can't be honest to say if I went in it. [¶] ... [¶] ... I went in so many at times and been so drunk, I'd be lying to tell you I for sure went in that car or not."

Perryman denied committing the Leung carjacking. The only reason he pled guilty to robbing Leung was because he wanted to get out of jail, though he admitted he was guilty of a "property" crime and "getting involved with the wrong people."

Perryman explained he "couldn't physically" jump through a car window "with all my illness." He had difficulty walking because he had metal bolts in his left leg and a "32–stitch dog bite wound" on his right leg, which he received from a police dog as he was being pursued after the Leung carjacking. He had "major skin grafting surgery" on his right hand which made it difficult to make a fist. He also testified he had all his teeth when he was arrested on April 22 even though the booking photo showed missing teeth, stating "I don't know how you guys got the teeth out of my mouth, but you did that."

*People v. Perryman*, 2011 WL 5865238, *1-4 (Cal. Ct. App. 2011) (Ans. Ex. 8.)

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384–86 (2000), while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. Where constitutional error is found, habeas relief is warranted only if the error at issue had a "substantial and injurious effect on the verdict." *Penry v. Johnson*, 532 U.S. 782, 796 (2001) (citation omitted).

6

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).[1]

## DISCUSSION

### 1. D.N.A. Evidence

Petitioner alleges that his first attorney, Randall Martin of the San Francisco County Public Defender's Office, sought $1200 from his office to conduct an independent analysis of the D.N.A. evidence. The prosecution's crime lab had found a match between Petitioner's D.N.A. and D.N.A. evidence from the steering wheels of Sebastiano's and Messick's cars. According to Petitioner, Martin wanted to have an independent test of the D.N.A. evidence after he consulted another attorney, Bicka Barlow, who criticized the crime lab's testing methodology. Before Martin could obtain this test, however, Petitioner discharged him as his attorney. Petitioner complains that his new attorney, Kenneth Quigley, refused to conduct the independent testing of the D.N.A. evidence on because Petitioner admitted to being in Messick's car and the possibility of being in Sebastiano's car as well.

Petitioner does not identify what federal constitutional right he believes was violated by the foregoing, but his assertion that Quigley erred in failing to seek an independent analysis of the D.N.A. evidence implicates his Sixth Amendment right to the effective assistance of counsel. Under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), the claim of ineffective assistance of counsel must be evaluated using two-prongs. Under the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. When assessing performance of defense counsel under this first prong, the reviewing court must be "highly deferential" and must not second-guess defense counsel's trial strategy. *Id.* at 689. Thus, the relevant inquiry is not what defense counsel

---

[1] Except where noted below, the state courts summarily denied almost all of the claims in the instant petition on habeas review. (Ans. Exs. 9 -13.)

7

could have done but rather whether the choices made by defense counsel were reasonable. *See Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). There is a "wide range of reasonable professional conduct," and a "strong presumption" that counsel's conduct fell within that range. *Strickland*, 466 U.S. at 689. Under the second prong of the *Strickland* test, petitioner bears the "highly demanding" and "heavy burden" of establishing actual prejudice. *Williams v. Taylor*, 529 U.S. 362, 394 (2000). It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if, as here, the petitioner cannot establish incompetence under the first prong. *Siripongs v. Calderon,* 133 F.3d 732, 737 (9th Cir. 1998).

Petitioner cannot establish incompetence under the first prong of *Strickland* because the decision not to pursue an independent test of the D.N.A. evidence was objectively reasonable. The purpose of conducting such a test would be to cast doubt on the results of the prosecution's own D.N.A. tests, which showed that Petitioner had been in Messick's and Sebastiano's cars. Quigley could reasonably conclude that this would be a pointless exercise because whether Petitioner was in the cars was not a disputed issue at trial. Petitioner admitted that he had been in Messick's car, and although he did not remember definitively being in Sebastiano's car, he conceded that it was possible. Quigley could reasonably conclude that it would not be worth the expense of independent D.N.A. tests that, given Petitioner's admissions, were also likely confirm the prosecution's results, and instead pursue the alternate defense based on Petitioner's assertion that he had been in the cars to do drugs and pretend to drive after the cars had been abandoned. As Quigley's actions were objectively reasonable, under *Strickland* Petitioner's Sixth Amendment right to the effective assistance of counsel was not violated. Accordingly, the state courts' rejection of this claim was neither contrary to nor an unreasonable application of federal law.

2. **Discovery of "New" Evidence**

Petitioner cites a letter that Quigley received from the San Francisco District Attorney while his direct appeal was pending in the California Court of Appeal. (Ans. Ex. 13 at 33.) This letter stated that Inspector Danker, who was involved in the investigation and lineups in

Petitioner's case, "has material in his personnel file since May 6, 2005, that may be subject to disclosure under *Brady*." (*Id.*)  The letter does not describe the material about Danker, but Quigley later informed Petitioner that when he investigated the issue, he discovered that it "involved allegations of tampering with photo lineups, or otherwise encouraging witnesses to make identifications of suspects." (*Id.* at 39.)  However, Quigley's investigation led him to conclude that the information about Danker's past misconduct did not apply to Petitioner's case. (*Id.*)  Petitioner does not assert that any constitutional violation occurred, but rather he seeks a discovery order to have the San Francisco District Attorney's Office turn over the information in Danker's file that was referenced in the letter in the event that it may show that Danker tampered with the lineups or otherwise tainted the witness's identifications in this case. (Pet. at 10-12.)

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course. *See Bracy v. Gramle,* 520 U.S. 899, 904 (1997).  However, Rule 6(a) of the Federal Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254, provides that a "judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."  Before deciding whether a petitioner is entitled to discovery under Rule 6(a) the court must first identify the essential elements of the underlying claim. *Bracy*, 520 U.S. at 904.  The court must then determine whether the petitioner has shown "good cause" for appropriate discovery to prove his claim. *See id.*  Good cause for discovery under Rule 6(a) is shown "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . ..'" *Id*. at 908-09 (*quoting Harris v. Nelson*, 394 U.S. 286, 299 (1969)); *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005).

The record demonstrates that allowing Petitioner to obtain the discovery material would not provide him with information helpful to his case or entitle him to relief, either on a

*Brady* claim or a due process claim that the lineup procedure was tainted.[2]  The record shows that Petitioner's counsel, Quigley, investigated the District Attorney's information about Danker's misconduct, and Quigley learned that it did not apply to Petitioner's case.  This is consistent with the District Attorney's letter to Quigley, which states that the information about Danker dates back to May 6, 2005, after the photo lineups in this case had already taken place.[3]  In addition, the witnesses who participated in the lineups, as well as Danker, were extensively examined at trial about the lineup procedures, and they all denied that the police applied any pressure or used any suggestive methods, including highlighting any particular photos, confirming any positive identification, or allowing witnesses to confer.  (Reporter's Transcript ("RT")[4] 495-500, 522-27, 584-86, 792-96, 803-09, 851-62, 874-77, 954-63.)  Moreover, all of the photos upon which the identifications were based were submitted to the jury for their independent evaluation.  (RT at 851-52, 855, 858-59, 956.)  The California Court of Appeal also reasonably explained in detail why the pretrial Sebastiano photo lineup and the in-trial identification by DiGalbo were not unduly suggestive.  *See Perryman*, 2011 WL 5865238 at *4-6.  As Petitioner has not shown that the material he seeks would have produced information that would call into question the validity of the identification procedures used in his case, he has not shown good cause to obtain the material via discovery.

**3.     Ineffective Assistance of Counsel**

Petitioner makes a number of claims that Quigley provided ineffective assistance at trial.  The standard for such claims established by *Strickland* is set forth above and need not be reiterated here.  The Court addresses each of his claims in turn.

   a.     Introduction of D.N.A. Evidence

Petitioner claims that Quigley should have introduced the report by Bicka Barlow, discussed above, criticizing the prosecution's D.N.A. test methods.  The Court has already

---

[2] Petitioner also argues that appellate counsel was ineffective in failing to raise this claim in a habeas or coram nobis petition.  However, there is no right to counsel in state collateral proceedings. Coleman v. Thompson, 501 U.S. 722, 755-57 (1991).

[3] The only exception is the last photo lineup for DiGalbo, but she did not identify Petitioner at that lineup.

[4] The Reporter's Transcript is Exhibit 1 to the Answer.

10

explained above that because of Petitioner's admissions at trial to being in the victims' cars, counsel could have reasonably chosen not to challenge the D.N.A. evidence and instead pursue a different defense strategy. Accordingly, this claim fails.

### b. Quigley's Illness and Forgetfulness

Petitioner claims that Quigley was ineffective because he was sick and forgetful during the trial. Quigley states in a declaration that he had the flu during trial and suffered from nausea, headaches, excessive sweating and fatigue. (Ans. Ex. 13 a 69.) He was under the care of two doctors, who prescribed him medication, and he was forgetful but does not know whether that was caused by his illness. (*Id.*) Quigley does not state that he performed deficiently, but rather he leaves that determination to "others." (*Id.*)

Petitioner does not cite any specific errors by Quigley related to his illness or forgetfulness. A defendant can make out a claim of ineffective assistance of counsel only by pointing to specific errors made by trial counsel. *See United States v. Cronic*, 466 U.S. 648, 666 (1984); *Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998) (inexperience alone does not establish ineffectiveness); *see Smith v.Ylst*, 826 F.2d 872, 875 (9th Cir. 1987) (mental incapacity of counsel does not require per se reversal of conviction; defendant has burden to point to specific errors). As Petitioner does not point to any specific errors caused by Quigley's illness, or any instance in which Quigley forgot something necessary, he has not shown that his Sixth Amendment right to the effective assistance of counsel was violated.

### c. *Faretta* Motion

Petitioner also faults Quigley for not appealing the trial court's denial of his motions to represent himself under *Faretta v. California*, 422 U.S. 806, 832 (1975). The Court explains below that the trial court's decision was proper insofar as there were valid reasons to find Petitioner's request equivocal. As a result, Quigley's decision not to challenge the denial of the motion on appeal was neither unreasonable nor prejudicial. *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (appellate counsel will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he declined to raise a weak issue).

11

1        d.       <u>Severance Motion</u>

2      Petitioner claims that Quigley should have appealed the trial court's denial of his motion to sever the trial on charges stemming from the DiGalbo incident from trial on the Sebastiano and Messick charges. Petitioner's appellate counsel actually challenged the trial court's denial of severance in his direct appeal, but the California Court of Appeal upheld the trial court's ruling. *See Perryman*, 2011 WL 5865238 at *6-7. The California Court of Appeal found that joinder of the charges was permissible because the evidence of the different incidents were cross-admissible. *Id.* Specifically, all of the carjackings shared common distinctive characteristics, and therefore evidence of the DiGalbo would be admissible in a separate trial on the other charges as part of a common design or plan. *Id.* at *7 (citing Cal. Ev. Code § 1101). Consequently, the joinder of the charges did not cause prejudice. *Id.* This is a reasonable analysis of the claim, and Quigley could reasonably decide that the claim would not succeed in an interlocutory appeal.[5] Furthermore, there is no apparent reason, let alone any reason provided by Petitioner, that there would have been a different result if Quigley had attempted to make this claim in an interlocutory appeal. Consequently, Petitioner has failed to establish either deficient performance or prejudice from Quigley's failure to file an interlocutory appeal of the trial court's denial of the severance motion.

18        e.       <u>Similar Crimes</u>

19      Petitioner claims that Quigley was ineffective in failing to investigate two allegedly similar carjackings that took place while Petitioner was in jail. For the reasons discussed below, this claim fails.

22        f,       <u>Bloody Jacket</u>

23      Petitioner claims that Quigley was ineffective in failing to investigate blood found on DiGalbo's jacket. For the reasons discussed below, this claim also fails.

---

[5] For the same reasons, i.e. the lack of prejudice stemming from the cross-admissiblity of evidence, the California Court of Appeal's denial of the claim is neither contrary to nor an unreasonable application of federal due process limitations on joinder of criminal charges. *See Sandoval v. Calderon,* 241 F.3d 765, 771-72 (2001) (joinder does not violate due process if there is no actual prejudice, as in when evidence on one charge is cross-admissible on other similar charges).

12

g. *Pitchess* Motion

Petitioner faults his "trial attorney" for allegedly refusing to file a motion pursuant to *Pitchess v. Superior Court*, 11 Cal.3d 716 (1974), which authorizes a defendant to compel discovery of evidence in a law enforcement officer's personnel file that is relevant to the defense. Petitioner's claim is contradicted by the record, which shows both that counsel made such a motion, and that it was partially successful. (CT at 998-1017, 1024-25.) Accordingly, this claim fails.

h. Substitution of Counsel

Petitioner claims that the trial court should have granted his motion to substitute Quigley for another attorney. The record shows that Petitioner never actually made such a motion. Rather, on December 5, 2008, Quigley moved to withdraw as counsel, and Petitioner stated that if that motion was denied, "I will file a [substitution motion]." (CT at 1096, 1130-31.) The trial court denied the motion to withdraw (CT at 1136), but there is no record that Petitioner ever made substitution motion thereafter. Accordingly, the record does not support Petitioner's claim that the trial court violated his Sixth Amendment right to effective assistance of counsel by denying a motion to substitute Quigley with a different attorney.

Denying Quigley's motion to withdraw as counsel also did not violate Petitioner's right to the effective assistance of counsel. In Quigley's motion to withdraw, he stated that he and Petitioner had a "fundamental disagreement" on the proper trial strategy; Petitioner wanted to fight every "issue to the fullest," whereas Quigley wanted to "focus narrowly on" the weaknesses in the prosecution's case. (CT at 1130-31.) The motion was supported by a year-old declaration by Quigley describing their disagreement. (CT at 1135.) On the other hand, Quigley had more recently filed another declaration in support of an unrelated motion stating that Petitioner trusted him and was satisfied with his representation, and at the hearing on the motion to withdraw, Quigley conceded that they had a "personal rapport." (CT at 1056, 1133-34.)

Quigley's desire to withdraw and the disagreement he describes did not necessitate substitution of counsel. The Sixth Amendment is not violated by "every conflict or

13

disagreement between the defendant and counsel." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc). On federal habeas review, the question is not whether the trial court abused its discretion in denying a motion, but rather whether a conflict between the defendant and counsel "prevented effective assistance of counsel." *Id.* at 1026. Unless the conflict resulted in constitutionally ineffective assistance under *Strickland*, habeas relief is not warranted. *Id.* A federal habeas court must determine the nature and extent of the conflict between the petitioner and counsel and whether that conflict deprived Petitioner of the representation to which he was entitled under the Sixth Amendment. *Id.* at 1027. The nature of the conflict in this case was simply a disagreement over trial strategy, which quite clearly is not a sufficiently intractable conflict to require substitution of counsel. *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("Disagreements over strategical or tactical decisions do not rise to level of a complete breakdown in communication" so as to require substitution of counsel). More importantly, neither Petitioner nor the record show that Quigley's representation was constitutionally lacking: all of Petitioner's claims that Quigley was ineffective, for the reasons discussed above and below in this Order, fail to meet the *Strickland* standard. Nor has Petitioner otherwise shown that he received ineffective representation. As Petitioner did not receive ineffective assistance of counsel, the failure to substitute counsel did not violate his Sixth Amendment rights.

**4.**     *Faretta* **Motion**

Petitioner claims that the trial court improperly denied his motion to represent himself under *Faretta v. California*, 422 U.S. 806, 832 (1975). A criminal defendant has a Sixth Amendment right to self-representation. *Id.* But a defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay. *Id*. at 835.

Petitioner claims that he made the motion several months before trial started, but the trial court nevertheless denied it on the grounds that it was brought too close to the beginning of trial. Petitioner's claim is contradicted by the record. The trial court did not deny the motion on timeliness grounds, but rather because Petitioner's request was equivocal. (RT at

14

276.) The trial court based this finding on a number of facts. First, Petitioner's request to represent himself was combined with a request to proceed as co-counsel with Quigley. (*Id.*; Clerk's Transcript[6] ("CT") at 1033.) In addition, Petitioner had previously been pro per in the case and ran into difficulties, and Petitioner indicated that his request was based on a change in his jail housing. (CT at 1062; RT at 276.)

These facts reasonably support the trial court's conclusion that the request was equivocal. Petitioner's request to proceed pro per as an alternative to proceeding as co-counsel with Quigley certainly showed ambivalence about self-representation. *See e.g. United States v. Mendez-Sanchez*, 563 F.3d 935, 946 (9th Cir. 2009) (request to proceed as standby counsel and for self-representation shows that *Faretta* request is equivocal). In addition, there were signs that Petitioner would change his mind about proceeding pro per, as he had done so previously and his jail housing could unpredictably change back again. Petitioner also had been through a significant number of different arrangements with his representation: he had been pro per with advisory counsel, then advisory counsel was relieved, then he was appointed counsel (Martin), and then he replaced Martin with a new lawyer (Quigley). Under these circumstances, the state court could reasonably conclude that Petitioner's request to represent himself was equivocal and deny the request on that basis.

### 5. Quashed Subpoena for D.N.A. Evidence

Petitioner claims that the trial court improperly quashed his pretrial subpoena requesting records of D.N.A. evidence from the California Department of Justice. His attorney Martin served a subpoena requesting six types of evidence. (Ans. Ex. 2 at 22-25.) The Department of Justice responded that four did not exist and one type would be provided, and moved to quash the other request, which was for the "database of all convicted offender samples." (*Id.* at 4-18.) Following a hearing, the trial court granted the motion to quash. (RT at 41-49.) In addition to complaining that the trial court denied the motion, Petitioner faults Quigley for not appealing that ruling.

---

[6] The Clerk's Transcript is Exhibit 1 to the Answer.

15

1   Petitioner does not identify any federal constitutional right that was violated. To the
2 extent the trial court's ruling excluded evidence from the trial, the due process guarantee of a
3 fair trial and the Sixth Amendment right to present a defense could be implicated. *See*
4 *generally Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (exclusion of evidence may
5 violate due process if it rendered the trial fundamentally unfair). And the Sixth Amendment
6 right to effective assistance of counsel could be implicated under *Strickland* by the complaint
7 that Quigley failed to file an interlocutory appeal of the trial court's ruling. None of these
8 rights were violated here, however. To begin with, defense counsel conceded at the motion to
9 quash hearing that there was no known exculpatory D.N.A. evidence in the state database; he
10 was hoping that a D.N.A. profile of another person matching the D.N.A. found on the steering
11 wheels might turn up in a search of the database.[7] Therefore, there is no indication trial
12 court's ruling excluded any actual evidence helpful to Petitioner. Even if there was evidence
13 of another D.N.A. match in the database, Petitioner was not prejudiced by its absence. As
14 discussed above, Petitioner admitted to being in Messick's car and conceded that he could
15 have been in Sebastiano's car. This admission rendered the prosecutor's D.N.A. evidence
16 placing him in the two cars largely extraneous, and there was no longer a need to refute such
17 evidence with further D.N.A. evidence that might show that a different person could also have
18 touched the steering wheels. Therefore, Petitioner did not suffer prejudice from being unable
19 to look for such evidence in the state's database. Consequently, Petitioner is not entitled to
20 habeas relief on this claim.

21 **6.    Other Crimes**

22   Petitioner claims that Quigley was ineffective in failing to investigate two allegedly
23 similar carjackings that took place while Petitioner was in jail. Petitioner bases this claim on
24 the trial testimony of one of the investigating police officers, Officer Pomatto. After Officer
25 Danker testified that he had never seen a carjacking done in the same style as the charged
26 offenses, Officer Pomatto testified that over the preceding eight years he had investigated two

---

[7] The trial court could reasonably find that turning over the state's entire D.N.A. database is a considerable burden for a speculative hope of finding another match.

16

1   carjackings in which the perpetrator had smashed a window with a concrete cover.  (RT at
2   891.)
3          Petitioner has provided no evidence to support his assertion that Quigley did not
4   investigate these two other carjackings.  The record does not state whether or not he made
5   such an investigation.  In any case, Petitioner has not shown that Quigley's not to investigate
6   those carjackings was either unreasonable or prejudicial.  It was not in fact clear that they had
7   occurred while Petitioner was in jail because Pomatto testified they occurred in the previous
8   eight years.  Pomatto did not, contrary to Petitioner's contention, testify that the two
9   carjackings involved the perpetrator diving through the broken window, punching the female
10  driver in the face, and repeatedly swearing at her until she left the car.  (*See id.*)  Indeed, the
11  only similarity between the two carjackings Pomatto had investigated and the charged crimes
12  was that the perpetrator smashed a window of the jacked car, undoubtedly a common
13  occurrence in many carjackings.  Even the implement used, a concrete cover, differed from
14  the metal object and utility box used in the charged crimes.  Given such a slight similarity, the
15  two carjackings that Pomatto referenced were not useful or exculpatory evidence that
16  reasonably necessitated further investigation, nor did the absence of further investigation
17  prejudice the outcome of the trial.  Accordingly, habeas relief is not available on this claim.

### 7.     **<u>Bloody Jacket</u>**

       Petitioner claims that Quigley was ineffective in failing to test blood found on
DiGalbo's jacket in order to determine whether the blood came from someone other than
DiGalbo or Petitioner.  Officer Danker testified that he took a bloody jacket from DiGalbo at
the hospital, and that the blood was never tested to ascertain its origin.  (RT at 1006.)
Petitioner points to no evidence in or outside the record suggesting that the blood came from a
third party; he merely hopes that it would have.  If the blood had come from a third party, that
would certainly be a boon to his defense.  On the other hand, if the test showed that the blood
came from Petitioner, this would devastate his defense and virtually assure a guilty verdict.  In
light of the other evidence indicating that Petitioner was in fact the perpetrator (his admissions
to being in the cars, the identifications, the common distinctive methods with the other

17

crimes), Quigley could reasonably decide not to take a significant risk of a test result that would confirm his guilt. The undisputed evidence of DiGalbo's injuries suggests that the most likely source of the blood was DiGalbo herself. Such a test result would only cause further discussion of her injuries, arise more sympathy for her, and provide no discernible benefit to Petitioner. Under these circumstances, the state courts in rejecting this claim could reasonably conclude that the failure to test the blood was a reasonable strategic decision by counsel. Accordingly, habeas relief is not warranted on this claim.

### 8. Petitioner's Heart Condition

Petitioner claims that he was incompetent to stand trial because he had a heart attack several months before trial began, and then during trial he fell down and suffered from chest pains and dizziness. A defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 412 (1960). Petitioner demonstrated more than adequate ability and understanding to meet the competency standard. He testified at length in his own defense, and his testimony was detailed, coherent and rationally responsive to the questions, demonstrated an understanding of the factual and legal issues, and recalled facts from years earlier. *See Benson v. Terhune*, 304 F.3d 874, 885-86 (9th Cir. 2006) (lengthy, logical and cogent testimony shows legal competence). The record also shows that Petitioner did not want the trial to stop: on numerous occasions, he insisted on continuing despite his dizziness and other symptoms, and once he refused the trial court's offer of a recess to allow him to rest. (RT at 901, 1016-17, 1025, 1053, 1060, 1062-63, 1066.) His physical limitations did not deprive him of his mental acuity or ability to actively participate in his defense, and certainly to meet the constitutional standard for competency. Accordingly, habeas relief is not warranted on this claim.

## CONCLUSION

For the foregoing reasons, the Court DENIES the petition for a writ of habeas corpus. A certificate of appealability will not issue. Reasonable jurists would not find the Court's

assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Court of Appeals.  The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: August 13, 2014

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**